# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SANDHYA G. DESMOND, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIV. ACTION NO. |
| | : | 3:08-CV-346 (VLB) |
| YALE-NEW HAVEN HOSPITAL, INC. | : | |
| Defendant. | : | September 10, 2010 |

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [Doc. #77]

The Plaintiff, Sandhya G. Desmond, filed this action against her former employer, Yale-New Haven Hospital, following termination of her employment as a physician assistant. The Plaintiff's third amended complaint asserts a single claim for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12117, alleging that she was terminated on account of her disability. She seeks declaratory and injunctive relief, compensatory and punitive damages, and attorney fees and costs. Presently pending before the Court is the Defendant's motion for summary judgment. The Defendant argues that the Plaintiff cannot establish a prima facie case of discrimination because she has failed to produce evidence that she could perform the essential functions of her job as a physician assistant, with or without reasonable accommodation, and further, even if she can establish a prima facie case, her claim still fails because she has produced no evidence that the Defendant's decisions were a pretext for discrimination. For the reasons that follow, the Defendant's motion is GRANTED.

# I. FACTUAL AND PROCEDURAL HISTORY

The following facts are undisputed for the purposes of the Defendant's motion for summary judgment unless otherwise noted. In June 2003, the Plaintiff, Sandhya Desmond, began work as an at-will employee with the Defendant, Yale New Haven Hospital, in the position of physician assistant assigned to endocrine surgical service. She continued employment in this position until her termination on August 19, 2005.

As a physician assistant, the Plaintiff was required to assist in providing "optimum care" for the Hospital's patients, which included the performance of many physical duties. (Pl. Exh. 1, Job Description). Some of the duties listed on the job description for a physician assistant included admitting patients pre and post-operatively, performing and documenting a complete history and physical examination of patients, assessing and monitoring patients throughout the day, making rounds with the surgical residents, performing dressing changes, removal of drains and tubes and other procedures, and drawing blood and starting IV's if the usual teams for this function were not available. Id.

In addition, the Plaintiff had an initial review period during which she had to be "marked off" on certain procedures before she would be fully credentialed to work in the surgical department. (Def. Exh. 5, Credentialing "mark off" sheet). These procedures included assisting in the operating room, suture and staple removal, wound care including dressings, placement and removal of steristips, irrigation, and packing with iodoform, suturing, removal of drain and drain care, blood draws, foley/bladder catherization placement, and conducting history and

physical examinations.  Id.  The Plaintiff claims, however, that the "mark off" sheet was not a checklist of essential functions, but was instead a list of procedures that she had performed since beginning work with the Defendant. According to the Plaintiff, she was asked to provide the list by Dr. Seashore after she had been hired, credentialed for employment, and had begun working in the surgical department.

The Defendant further contends that the Plaintiff needed to complete all "privileges" on a different itemized list as a prerequisite to her continued employment as a physician assistant.  (Def. Exh. 6, Privilege itemized sheet). These "privileges" included placing IV lines, venipuncture, arterial puncture and catheterization, administering local anesthesia , suturing wounds, dressing wounds, removing sutures, minor burn care, bladder catheterization, placement of nasogastric tube and gastric lavage, and assisting in the operating room.  The Plaintiff claims, however, that the list by its terms granted privileges to the Plaintiff if the listed procedures were "observed and certified."  Id.  The document explicitly states that "[a]ny privileges not initialed will be removed from the PA's list of approved activities," but does not indicate that the absence of certification for any particular activities on the list will result in termination of employment.  Id. The Plaintiff admits that she believes she completed all applicable procedures on the list to a satisfactory measure.

In addition, the Plaintiff and her supervising physician, Dr. Sanziana Roman, signed a "Delegation Agreement" which described medical duties that the "physician may delegate" to the physician assistant "when such care is

within the PA's skills and forms a component of the physician's scope of practice." (Def. Exh. 7, Delegation Agreement). The delegated duties included placing and removing nasogastric tubes and urinary and other catheters, providing care for drains and wounds, and removing abdominal drains. Id. The Defendant claims that the Plaintiff was expected to perform these delegated duties in her role as a physician assistant. The Plaintiff contends, however, that the form did not identify the medical procedures she was "expected to perform," but instead merely identified the medical procedures that may, but did not have to be, delegated to the Plaintiff by her supervising physician.

The Plaintiff elaborated upon her job responsibilities during her deposition. The Plaintiff's duties as a physician assistant on a surgical service included admitting patients, both pre and post-operatively, which she claimed she performed only rarely. (Def. Exh. 1, Deposition of Plaintiff, hereinafter "Desmond Depo.", at 23-24). The Plaintiff saw patients every day, about half of the time by herself without another member of the medical team. Id. at 35-36. When the residents would go to surgery, physician assistants would maintain the floor and the needs of the patients on the floor, including removing and replacing wound dressings. Id. at 35, 42. As part of the medical team, the Plaintiff also took verbal examinations of patients and assessed the specific site of the patients' pain or discomfort. Id. at 23-24. The Plaintiff conducted these site specific physical examinations on a daily basis. Id. at 25. For the average patient, the Plaintiff would examine the chart, talk to the patient, and evaluate the wound site if the patient complained of pain. Id. at 41-42.

Assessing post-surgical wound sites was a primary function performed by the Plaintiff as a physician assistant on the medical team. Id. at 50. Her responsibilities also included packing and unpacking patients' wounds, which she did on average at least once per week. Id. at 37-39. The Plaintiff was also required to undress wounds to examine their healing, and to remove sutures or staples and re-dress the wound. Id. at 26-27. In addition, she was required to palpate the patient's body part that was hurting, and possibly the other side of the body for comparison. Id. When performing these functions, the Plaintiff would remove the dressing herself, examine the wound, and put back the dressing. Id. at 42. Examining the wound included checking for bleeding or infection, which entailed palpating toward the wound to see if the patient was experiencing pain and feeling the wound site for warmth. Id. at 44-45. In addition, the Plaintiff was required to check suturing to make sure it was proper and intact. If there was a problem, she would touch the wound area to make sure there was no bleeding underneath the wound site. Id. at 46-47. Making such assessments, including examining wounds, palpating, and changing dressings, were essential functions of physician assistants. Id. at 53. Performance of these duties frequently required rolling or lifting bedbound patients. (Def. Exh. 4, Rienzo Aff., ¶ 6). Other essential responsibilities included removal of drains and tubes. (Def. Exh. 1, Desmond Depo., at 61). The Plaintiff's duties also involved "build[ing] a differential diagnosis" for patients, including diagnosing what was wrong with wounds. Id. at 48-49.

The Plaintiff further testified as to a number of other physical tasks she performed as a physician assistant.  She examined patients' hearts and lungs and took their pulse.  Id. at 27-28.  As a member of the endocrine team, she was also required to check patients' necks following thyroid surgeries.  To conduct this examination, the Plaintiff went behind the patient and palpated the neck to determine if there was swelling or lumps.  She also examined patients' extremities if they complained of pain, and checked pulses to evaluate circulation.  Id. at 28-29.  Further, the Plaintiff examined patients' feet, particularly if they had diabetic neuropathy.  She would sometimes put special venodyne boots on patients if medically necessary, which required taking a pulse from several locations and providing warnings to the patient in order to avoid causing harm to toes.  Id. at 30-32.  The Plaintiff also performed "head to toe" examinations on rare occasions.  Such an examination included checking the patient's eyes, ears and mouth, holding a cotton swab or tongue depressor, and tapping the patient on the cheek or above the lip with her finger.  Id. at 25-26.  If a patient complained of breathing problems, she checked the patient with a stethoscope and called for consultation assistance.  Id. at 43.  An examination may also require palpating the abdomen or other areas of the body, percussing the lungs or abdomen (that is, striking the body for diagnostic purposes), checking grip strength and extremity strength, and testing sensation.  (Def. Exh. 4, Rienzo Aff., ¶ 6).  The Plaintiff also put on tourniquets for patients' blood draws, which she estimated performing once per week.  (Def. Exh. 1, Desmond Depo., at 55-56).

The Plaintiff was also responsible for assisting the surgical team in surgery.  Id. at 55.  When assisting with surgery, the Plaintiff would dress for surgery and retract the wound so that the physician could see where he or she was operating.  Id. at 57.  She was also responsible for using a suction device to suck blood around the area at which the physician was operating.  Id. at 58.  The Plaintiff also sometimes sutured during surgery under supervision.  Id.  Following surgery, the Plaintiff sometimes put in a set of orders for the patient, which required her to use a computer mouse.  Id. at 59.  She was also responsible for typing orders into the computer and writing notes regarding her observations in the patient's chart.  Id.  Another of the Plaintiff's primary responsibilities as a physician assistant was to assess and monitor patients throughout the day.  Id. at 60.  The Plaintiff admitted that it was necessary for her to run to assist a patient if the patient had an urgent need.  Id.  The Plaintiff's supervisor confirmed that the Plaintiff had significant physical obligations when assisting in surgery, such as holding and manipulating clamps, sometimes for extended periods, using suction and electrocautery, cutting tissue or suture, handling suture material and sometimes placing sutures, draping and undraping the patient, and assisting with transfer of the patient from the operating room table to a stretcher.  (Def. Exh. 4, Rienzo Aff. ¶ 7).

Finally, the Plaintiff was trained in cardiopulmonary resuscitation ("CPR"), which was a requirement of her job.  (Def. Exh. 1, Desmond Depo., at 196).  If a patient was not breathing, the Plaintiff would ordinarily call for help and then begin CPR in moments.  Id. at 197.  This would involve laying the patient on his

back, cocking his head back to create an open airway, ascertaining whether air was coming through, and checking his pulse, all performed as soon as possible under urgent circumstances. Id. at 197-98.

While the Plaintiff does not deny that there were many physical duties that constituted principal functions of her job, she claims that none of them were required to be performed by her individually. Instead, she asserts that these functions were shared amongst the "medical team," which included residents, students, and other physician assistants. (Pl. Exh. 1, Job Description; Def. Exh. 1, Desmond Depo. at 51-53, 66-67).

On December 30, 2004, the Plaintiff suffered a workplace injury while six months pregnant. She slipped and fell on the Defendant's property, which caused serious injury to both of her hands. The Defendant is a self-insured entity for purposes of workers' compensation. (Def. Exh. 20, Affidavit of Allison Ross, hereinafter "Ross Aff." ¶ 2). Accordingly, it has a medical care plan established pursuant to Conn. Gen. Stat. § 31-279. Under that plan, the Defendant makes available, "by contract with Participating Providers, Medically Necessary Services to Employees who are injured or suffer illnesses arising out of and in the course of their employment." (Pl. Exh. 19, YNHH Medical Care Plan).

In accordance with the medical care plan, on January 3, 2005, the Plaintiff began initial treatment for her injury with Dr. Mark Russi, a physician with the Defendant's Occupational Health office. (Pl. Exh. 69, Incident Report, December 30, 2004). The Plaintiff continued this treatment for the next two weeks while reporting to work as scheduled. Dr. Russi restricted the Plaintiff from working in

the operating room, but otherwise found her capable of returning to work. (Pl. Exh. 70, Occupational Health Note dated January 31, 2005). However, due to continued pain and swelling of the Plaintiff's wrists and hands, on February 2, 2005, Dr. Russi referred the Plaintiff for treatment to Dr. Carrie Swigart of Yale Orthopedics and Rehabilitation. Dr. Swigart diagnosed the Plaintiff with acute bilateral post-traumatic carpal tunnel injury, and administered bilateral injections of lidocaine with 1cc of Celestone. (Def. Exh. 10, Dr. Swigart Medical Note, February 2, 2005). The Plaintiff was removed from work for a few days to permit healing from that procedure. However, this turned out to be the Plaintiff's last day working at Yale New Haven Hospital. Id.

At the time of her deposition, the Plaintiff testified that she felt that as of February 2005 "an emergent situation would have been difficult [for her] to handle given the symptoms that [she] was then experiencing with [her] hands." (Def. Exh. 1, Desmond Depo. at 152). She indicated that she was having more difficulty managing the equipment at work, and was distracted because of the discomfort in her hands. However, Dr. Swigart advised that the Plaintiff defer any surgical treatment until after the birth of the Plaintiff's baby, and continue to see her as needed. (Def. Exh. 10, Dr. Swigart Medical Note, February 2, 2005). The Occupational Health Department placed the Plaintiff off-duty beginning on or about February 3, 2005 until February 15, 2005, at which time further assessment by both Dr. Swigart and Occupational Health was to take place. (Pl. Exh. 71, Occupation Health Note, February 3, 2005). Beginning on February 8, 2005, the Plaintiff began receiving temporary total disability benefits from the Defendant

through the Workers' Compensation Commission process, in accordance with the Defendant's obligations under the Connecticut Workers' Compensation Act, and those payments remain ongoing. (Def. Exh. 20, Ross Aff. ¶¶ 2-4). The Plaintiff contends that, while wage benefits were being paid, the delivery of medically necessary treatment was consistently delayed.

As of February 15, 2005, Dr. Swigart signed a medical note stating that the Plaintiff was unable to return to work until "further notice due to severe carpal tunnel." (Def. Exh. 10, Swigart Medical Note, February 15, 2005). Dr. Swigart also indicated that the Plaintiff "needs to wear a splint constantly" and advised that "the only options for [treating] her are continued splinting and being out of work until her delivery or surgery done under a straight local anesthesia." (Id.; Def. Exh. 1, Desmond Depo. at 155-56). The Defendant contends that there were essential functions of her job that the Plaintiff could not perform due to the use of the splints. The Plaintiff testified during her deposition that she does not recall if she was actually wearing splints on both wrists constantly. (Def. Exh. 1, Desmond Depo. at 155-56). While Dr. Swigart did not initially recommend surgery before the birth of the Plaintiff's child, at the Plaintiff's request she agreed to tentatively schedule a pre-delivery surgery date for the end of March 2005. (Def. Exh. 1, Desmond Depo., at 159). However, the Plaintiff gave birth early on March 5, 2005, before the surgery was performed. Thereafter, surgery was rescheduled for April 21, 2005. (Pl. Exh. 79, Dr. Swigart Absence Slip, April 15, 2005).

On April 11, 2005, the Defendant filed a Form 43 with the Workers' Compensation Commission indicating that it considered the birth of the Plaintiff's

baby to constitute an "intervening trauma," and seeking to have her workers'
compensation benefits rescinded for the time period from the birth on March 3,
2005 until at least April 16, 2005, pending the Defendant's receipt of medical
reports documenting the status of her injury on that date.  (Pl. Exh. 29, Form 43).
In a letter sent to the Plaintiff on the same date, the Defendant's workers'
compensation representative explained that the Plaintiff would receive short term
maternity disability benefits, rather than workers' compensation benefits, during
the period while she recovered from delivery of her baby, and that her status
relative to her work injury would be reevaluated once her maternity leave ended.
(Pl. Exh. 47, Defendant Correspondence with Plaintiff).  Subsequently, on April 13,
2005, the Defendant sent a notification to the Plaintiff indicating that she would be
using the available Family and Medical Leave Act (hereinafter "FMLA") leave for
her absence.  (Pl. Exh. 15, Defendant Correspondence to the Plaintiff).  The letter
provides:

> This is to inform you that your absence due to a
> workers' compensation injury or illness has been
> designated by the Hospital a Family and Medical Leave
> Act (FMLA) absence, *based on the information that it
> qualifies as a serious health* condition. Therefore,
> effective the date of this letter, you will be using your
> available FMLA leave for this absence.  Once that leave
> is exhausted, the Hospital will be notifying you in
> writing, that you may be required to return to work if you
> are medically able in your regular, or if available, light
> duty position.   The use of your FMLA leave applies
> regardless of whether the Hospital has accepted or is
> contesting your workers' compensation claim . . . .

Id.  In addition to the internal and Federal FMLA policies, the Plaintiff was also
provided a document which explains that the Defendant's "extensive Light Duty

program will allow you to return to work as soon as you are physically able to perform any type of work.  If you are not able to return to your regular job immediately, you will be assigned to a meaningful light duty job while you continue the rehabilitation process."  (Pl. Exh. 17, YNHH WC Policy).  However, it does not appear from the record that the Plaintiff ever sought to return to work in a light duty position.  Instead, she notified the Defendant on March 30, 2005 that she intended to delay her return to work in order to take some time off to care for her baby.  (Def. Exh. 11, Plaintiff's Correspondence with Stuart Warner).

While on maternity leave under the FMLA, the Plaintiff rescheduled her right carpal tunnel release surgery for April 21, 2005.  (Pl. Exh. 79, Dr. Swigart Absence Slip, April 15, 2005).  However, after receiving the Form 43 notifying her that the Defendant was seeking to have her workers' compensation benefits rescinded for the period she was on FMLA leave recovering from childbirth, the Plaintiff discussed her situation with Dr. Swigart and decided to postpone surgery until the issue of her eligibility for workers' compensation benefits and payment for the surgery was resolved.  As a result of this postponement, on April 28, 2005, the Defendant filed a Form 36 notifying the Plaintiff and the Workers' Compensation Commission of its intention to suspend her worker's compensation benefits because she "refused to proceed with reasonable surgery scheduled with Dr. Carrie Swigart on April 21, 2005."  (Pl. Exh. 22, Form 36).  The Form 36 further stated that the Plaintiff's right to benefits "should be suspended as of April 21, 2005 until she has the surgery in accordance with C.G.S. § 31-

294e(b)."[1]  The matter was ultimately cured on May 20, 2005 when the Defendant faxed a letter to the Plaintiff providing "written authorization" for the surgery and related post-operative medical treatment.  (Pl. Exh. 80, Defendant Authorization for Surgery and Treatment).  The right carpal tunnel release procedure was performed on May 23, 2005, up until which point there had been no resolution for the Plaintiff's symptoms.  (Def. Exh. 1, Desmond Depo. at 170).  The Plaintiff's FMLA leave expired on or about May 26, 2005.  (Def. Exh. 14, Termination Letter, Aug. 19, 2005).

Two weeks after the surgery, during her recuperative period, the Plaintiff experienced "burning and the increased shocks and sensitivity to even the lightest touch in more my right hand than my left . . .  Any function you could think of was difficult to do."  (Def. Exh. 1, Desmond Depo. at 173).  This condition continued after the surgery; however, the Plaintiff attributes this to the surgical procedure itself, and not the initial injury.  As the pain continued, the Plaintiff alerted the hospital or its attorney of her distress.  Id. at 175-76.  At her deposition, the Plaintiff testified as follows:

> I was very distraught of what was happening at home, not being able to take care of myself, dropping things. . . .  I was very concerned that [the baby] would get hurt unintentionally and my plea to Allison Ross was please, please, please, please provide me with the care that I needed at home that Dr. Swigart was prescribing and that was not being authorized by the hospital.

[1]  Conn. Gen. Stat. § 31-294e(b) provides:  "If it appears to the commissioner that an injured employee has refused to accept and failed to obtain reasonable medical and surgical aid or hospital and nursing service, all rights of compensation under the provisions of this chapter shall be suspended during such refusal and failure."

**Id.**

Prior to her injury, the Plaintiff was offered a position in the Defendant's Emergency Department, which she was ultimately unable to begin due to her absence and physical condition.  **Id.** at 207-209.  In an email correspondence on May 4, 2005, Ms. Rienzo, Manager of Physician Assistants, and Ms. Perrotti, the Manager of Employee Relations, discussed this potential move.  Ms. Rienzo expressed the belief that the Plaintiff "has no intentions of ever having surgery, but she will play it as if it is medically necessary as a means of prolonging her [workers' compensation]."  (Pl. Exh. 41, Correspondence between Lisa Perrotti and Rita Rienzo, May 4, 2005).

The Plaintiff's condition became progressively worse between February and June 2005.  She could not perform tasks such as holding a pen normally in the right or left hand.  Her function was significantly impaired, and she held her hands like claws.  (Def. Exh. 10, Medical Records of Plaintiff at 9; Pl. Exh. 1, Desmond Depo. at 184).  At the Plaintiff's deposition, she stated that as of June 2005, she would not have been able to perform the functions of a physician assistant at the Hospital.  (Pl. Exh. 1, Desmond Depo. at 184).  She also did not believe that she could have performed some required tasks, such as place a urinary catheter on a patient, attend to some types of drain wounds, or perform CPR.  **Id.** at 186, 260-61, 266.  The Plaintiff stated that the only accommodation that would have enabled her to work was medical treatment, and perhaps some sort of dictation process or the use of other clinicians to perform some of her duties.  However, the Plaintiff did not request any of these accommodations from

14

the Defendant during her employment.  Id. at 266-67.  The Plaintiff contends that she was denied the opportunity to request such accommodations and further, had the Defendant honored its FMLA policy by providing her with notice of an impending termination, she would have inquired about such accommodations. (Id. at 188; Pl. Exh. 15, Defendant Correspondence FMLA; Pl. Exh. 16 YNHH FMLA Policy).

Beginning on June 1, 2005, the Hospital paid for the services of a home health aide for the Plaintiff for six hours per day.  (Pl. Exh. 13, July 18, 2005 Letter from K. Falls and Other Written Inquiries).  On June 7, 2005, Dr. Swigart referred the Plaintiff to a pain management specialist, Dr. Steve Levine, M.D., of Advance Diagnostic Treatment Centers  for "prolonged and intensive occupational therapy for her [right] hand" to prevent the development of complex regional pain syndrome.  (Pl. Exh. 14, Dr. Swigart Medical Note, June 7, 2005; Pl. Exh. 20, Dr. Swigart Medical Note, June 14, 2005).  The Defendant authorized the recommended medical treatment, including the pain management evaluation by Dr. Levine, physical therapy for the Plaintiff's right hand, transportation to and from medical appointments as recommended by Dr. Swigart, and two additional weeks of a home health aide for six hours per day to terminate on July 1, 2005. (Pl. Exh. 28, Defendant's Correspondence to Plaintiff).

On July 18, 2005, the Defendant, by its attorney, while acknowledging that "the typical out-of-work period following a carpal tunnel release is approximately 4 to 8 weeks," sought an updated medical report from Dr. Swigart regarding the Plaintiff's condition, specifically her ability to perform sedentary or light duty

work, and any work instructions that may be appropriate. (Pl. Exh. 13, Defendant Correspondence to Dr. Swigart, July 18, 2005). In response, Dr. Swigart expressed the opinion that the Plaintiff's symptoms were not under control and advised that "she remains out of work" until further assessment to take place in a month or so. (Pl. Exh. 23, Dr. Swigart Medical Note, July 19, 2005). Dr. Swigart further opined that the Plaintiff would benefit from an evaluation by a psychiatrist for the potential treatment of depression associated with the symptoms of her injury, and that the left carpal tunnel release surgery would be delayed due to the complex regional pain syndrome. Id. The following day, Ms. Jamie Petrone of the Emergency Department referenced the Plaintiff's work status via email and stated that the Plaintiff "doesn't seem to think she is no longer going to be working here." In response, Mr. Paul Krochmal expressed the intent to seek recruits for the physician assistant positions, and to discuss available position openings with the Plaintiff upon her return to work. (Pl. Exh. 48, Correspondence from Ms. Lamb to Mr. Krochmak, July 19, 2005). Ms. Perrotti was carbon copied on this correspondence. Id.

By August 11, 2005, the Plaintiff admits that her condition had deteriorated, and that she remained totally disabled from work. (Def. Exh. 1, Desmond Depo. at 227-29). She further testified that she was not able to perform all of the essential functions of a physician assistant for the Hospital. Id. She had significant dysfunction of both hands, and thus needed help doing anything that required the use of two hands. Id.

On August 12, 2005, Dr. Swigart replied to the Defendant's request for medical support for the Plaintiff's request for treatment under workers' compensation with a prescription indicating that the Plaintiff was significantly limited in her ability, among other things, to lift more than two to three pounds and to transport herself. (Pl. Exh. 45, Dr. Swigart Prescription, August 12, 2005). The Defendant claims that based on this report by Dr. Swigart and prior medical records, Ms. Perrotti made the decision to terminate the Plaintiff's employment upon the belief that the Plaintiff could not perform the essential functions of her job, with or without reasonable accommodation. (Def. Exh. 13, Affidavit of L. Perrotti ¶ 4). The Defendant contends that Ms. Perrotti consulted with Ms. Rienzo about whether or not the Plaintiff could perform the essential functions of the job, with or without reasonable accommodation. (Id. ¶ 5; Def. Exh. 4, Affidavit of R. Rienzo ¶¶ 2-3). In addition to medical reports, Ms. Rienzo knew that the Plaintiff had been assessed as having complex regional pain syndrome and had reported unrelenting pain. Id. This exchange informed Ms. Perrotti's opinion that no accommodation existed that would allow the Plaintiff to effectively do her job, with the exception of an indefinite leave of absence. (Def. Exh. 13, Perrotti Aff ¶ 11).

The Plaintiff argues, however, that Ms. Perrotti did not make the determination to terminate her based on the medical record, as evinced by the July 19, 2005 correspondence, which purportedly demonstrates Ms. Perrotti's disbelief in the Plaintiff's disability. (Pl. Exh. 48, Correspondence from Ms. Lamb to Mr. Krochmal, July 19, 2005; Pl. Exh. 26, Affidavit of Lina Perrotti, January

2010).  The Plaintiff further asserts that she has no knowledge of any discussions between Ms. Rienzo and Ms. Perrotti; however, discovery has uncovered a conversation in which the two discuss "fram[ing] our accommodations . . . with clear expectations for return to work conditions [and] mak[ing] it difficult for her to wrestle out of."  (Pl. Exh. 40, Correspondence between Lina Perrotti and Rita Rienzo, January 13, 2005).

The Defendant sent the Plaintiff a termination letter on or about August 24, 2005, which outlines the rationale behind her termination.  (Pl. Exh. 44, Termination Letter, August 19, 2005).  According to the letter, the Plaintiff was terminated based upon the aforementioned August 12, 2005 medical report indicating that the Plaintiff still had significant restrictions that prevented her from returning to the position of physician assistant, with or without reasonable accommodation.  Id.  The letter further states that the Plaintiff's FMLA leave expired on May 26, 2005 and was extended until August 12, 2005 due to the Plaintiff's "special circumstances."  Id.  The Plaintiff takes issue with the Defendant's characterization of the extension of the FMLA leave as an accommodation.  Id.  The Plaintiff argues that if the statutory FMLA leave of absence under Connecticut law, which lasts six weeks, began on February 2, 2005, the last day the Plaintiff was in attendance as employee at the hospital, it would expire on or about May 26, 2005.  However, if the leave began on or about April 13, 2005, as indicated in letter regarding the Plaintiff's FMLA leave, it would expire on or about August 12, 2005.  (Pl. Exh. 15, Defendant Correspondence to Plaintiff, FMLA, April 13, 2005).  Also, the Plaintiff notes that the medical report

upon which the Defendant based its termination decision makes no assertion that the Plaintiff is 100% disabled or unable to work with or without accommodation. (Pl. Exh. 85, CHRO Decision on Request for Reconsideration, December 7, 2006).

On March 15, 2006, the Plaintiff filed a discrimination complaint with the Commission on Human Rights and Opportunities (hereinafter the "CHRO") alleging that discrimination motivated her termination. (Pl. Exh. 94, CHRO Charge of Discrimination, March 15, 2006). In the original Merit Assessment Review, the Complaint was dismissed due to untimely filing and failure to state a claim; however, on reconsideration, the CHRO found that further investigation could lead to a finding of reasonable cause. (Pl. Exh. 95, CHRO Merit Assessment Review, August 21, 2006; Pl. Exh. 85, CHRO Decision on Request for Reconsideration, December 7, 2006).

The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on June 2, 2006. In that complaint, the Plaintiff alleged discrimination in violation of the ADA and claimed that the impetus for her termination was "so that the workers compensation could continue to deny me proper medical attention, . . . and so that they would not have to grant me any reasonable accommodations when I am medically released to return back to work." (Pl. Exh. 54, EEOC Charge of Discrimination).

In a sworn reply memorandum submitted by the Plaintiff to the CHRO on June 27, 2006, the Plaintiff stated that "prior to the termination, [she] remained on total disability pursuant to the occupational injury. . . ." (Def. Exh. 17, Memorandum of June 27, 2006 from Plaintiff to CHRO at 11). As of October 21,

2009, the Plaintiff had not been released to work by her treating physician. (Def. Exh. 19, October 21, 2009 Letter from Plaintiff to Workers' Compensation Commission).

The Plaintiff filed her original complaint in this Court on March 6, 2008, against Yale New Haven Hospital and Concentra, Inc. (the Hospital's agent and utilization review provider for workers' compensation purposes), alleging violations of both the state Connecticut Fair Employment Practices Act and federal Americans with Disabilities Act ("ADA"). [Doc # 1]. On April 9, 2008, the Plaintiff filed an amended complaint pursuant to Fed. R. Civ. P. 15(a). [Doc. #15]. On March 23, 2009, the Court issued a Memorandum of Decision dismissing all counts against Concentra, Inc. and all of the Plaintiff's state law claims based on the exclusivity provision of the Connecticut Workers' Compensation Act. [Doc # 52]. The Plaintiff submitted a second amended complaint pursuant to Court order on April 15, 2009. [Doc. # 54]. This second amended complaint was rejected by this Court on June 10, 2009 on the basis that it alleged numerous facts not relevant to her sole surviving claim for employment discrimination in violation of Title I of the ADA. [Doc. # 57]. Pursuant to the Court's June 10, 2009 Order, the Plaintiff filed a third amended complaint on June 17, 2009. [Doc. #58]. On February 1, 2010, the Defendant filed the subject motion for summary judgment as to the Plaintiff's third amended complaint pursuant to Fed. R. Civ. P. 56(c), and the Plaintiff filed her opposition to the motion on March 31, 2010.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and…draw[s] all reasonable inferences in its favor." <u>Huminski v. Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004)(internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." <u>Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." <u>Huminski</u>, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

The United States Supreme Court has stated that "trial courts should not treat discrimination cases differently from other ultimate questions of fact."

<u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 148 (2000) (internal quotation marks omitted).  However, in an employment discrimination case where the intent of the employer is at issue, the trial court must be "especially cautious about granting summary judgment" because careful scrutiny of factual allegations may reveal circumstantial evidence to support the required inference of discrimination.  <u>Kerzer v. Kingley Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998).  The appropriateness of summary judgment depends on a number of factors.  These factors include the strength of the plaintiff's prima facie case and the probative value of proof that the employer's explanation is false, as well as any other evidence that supports the employer's case.  <u>Reeves</u>, 530 U.S. at 148 – 49.

### III. <u>DISCUSSION</u>

Employment discrimination claims brought pursuant to Title I of the ADA are subject to the burden-shifting analysis established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination; the burden of production then shifts to the employer to offer, through the introduction of admissible evidence, a legitimate, non-discriminatory reason for the discharge; and the plaintiff must then show that the proffered reason was merely a pretext for discrimination, which "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more."  <u>Heyman v. Queens Vill. Comm.</u>

**for Mental Health for Jamaica Cmty. Adolescent Program**, 198 F.3d 68, 72 (2d Cir. 1999).

In order to make out a prima facie case of discriminatory discharge against a covered employer under the ADA, a plaintiff must establish that: "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." **Giordano v. City of New York**, 274 F.3d 740, 747 (2d Cir. 2001).

The Defendant has not contested the applicability or sufficiency of the allegations of the third amended complaint respecting the first, second, and fourth elements. The Defendant argues, however, that the Plaintiff cannot make out a prima facie case of discriminatory termination because she was unable to perform the essential functions of her job, with or without reasonable accommodation, and remains unable to do so to this day.

## A. Ability to Perform Essential Functions

The Second Circuit has held that the plaintiff bears the burden of production and persuasion on the issue of whether she can perform the essential functions of the job in question, with or without reasonable accommodation. **Borkowski v. Valley Cent. School Dist.**, 63 F.3d 131, 137-38 (2d Cir. 1995). "A plaintiff cannot be considered 'otherwise qualified' unless she is able, with or without assistance, to perform the essential functions of the job in question. It follows that the plaintiff bears the burden of proving either that she can meet the

requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions." Id.

There appears to be no legitimate dispute in this case that the Plaintiff was unable to meet the requirements of her job without accommodation. As outlined above, the Plaintiff's job responsibilities as a physician assistant included numerous physical duties that required use of her hands. See supra Section I. These duties included, but were not limited to, examining patients, checking blood pressure and pulses, using a stethoscope, palpating around a wound site and other areas of a patient's body for pain, examining and dressing wounds, checking and removing sutures, placing nasogastric tubes and urinary catheters, removing drains and tubes, placing special boots on patients' feet, and drawing blood. The Plaintiff was also responsible for assisting the surgical team, which involved significant physical obligations that required the use of her hands. These duties included dressing for surgery, using clamps to retract the wound, using a suction device, placing sutures, draping and undraping the patient, and assisting with transferring the patient from operating table to stretcher. Notably, the Plaintiff was required to attend to patient emergencies, including the immediate administration of CPR, where the ability to respond promptly could make a difference between life and death.

Furthermore, the Plaintiff and her physicians have repeatedly recognized that she has lacked work capacity from February 2005 at least up until the time of her deposition in this case. The Plaintiff testified that as of February 2005, "an emergent situation would have been difficult to handle" because of the symptoms

she was experiencing with her hands. (Def. Exh. 1, Desmond Depo., at 152). At that time, the Plaintiff's understanding was that she was removed from duty "until the work-related injury clears sufficiently to allow the doctor to clear me to return to duty." Id. at 160. In addition, Dr. Swigart concluded that the Plaintiff was unable to return to work until "further notice." (Def. Exh. 10, Dr. Swigart Medical Note, February 15, 2005). Dr. Swigart noted that the Plaintiff had to wear a splint on her right wrist "constantly" and was unable to perform "routine light activities" with her hands such as buttoning buttons and zipping zippers due to the altered sensation and pain. (Pl. Exh. 11, Dr. Swigart Medical Note, February 15, 2005).

The Plaintiff had carpal tunnel release surgery on May 23, 2005. Thereafter, her condition further deteriorated. She testified that "[a]ny function you could think of was difficult to do," and that she was concerned because she was not able to take care of herself and her baby due to her condition. (Def. Exh. 1, Desmond Depo., at 173, 175-76. She also admitted that, as of June 2005, she would not have been able to perform the functions of a physician assistant because of the pain and reduced functionality in her hands, which she described having to hold like "a claw." Id. The Plaintiff admitted that, by August 11, 2005, her condition had deteriorated further and she remained totally disabled from work. Id. at 227-29. She had significant dysfunction in both hands, and thus needed help doing anything that required use of two hands. Id. On August 12, 2005, Dr. Swigart indicated via letter to the Defendant that the Plaintiff was significantly limited in her ability, among other things, to lift more than two to

three pounds and to transport herself. (Pl. Exh. 45, Dr. Swigart Prescription, August 12, 2005). Based upon this letter and preceding medical reports detailing her condition and symptoms, the Defendant made the decision to terminate the Plaintiff due to her inability to perform her essential job functions. (Def. Exh. 13, Perotti Aff., ¶¶ 9-10).

Medical records and other evidence from after the Plaintiff's termination indicate that she remained incapacitated. Neurologist Moshe Hasbani, who examined the Plaintiff, issued a report stating that she remained totally disabled as of February 7, 2006. (Def. Exh. 10, Hasbani Report, at 32). In a sworn memorandum to the CHRO, the Plaintiff admitted that, as of June 28, 2006, "it is unknown whether [she] might be able to return to work at some position in the reasonably distant future . . . ." (Def. Exh. 17, Memorandum to CHRO, at 15). In addition, psychiatrist Jerome Schnitt issued a report stating that the Plaintiff remained totally disabled by pain and depression as of May 22, 2008. (Def. Exh. 10, Schnitt Report, at 37). Indeed, at her deposition in this case, the Plaintiff testified that she was totally disabled from work and had no work capacity for the entire period between February 2, 2005 and April 27, 2009, the date of the deposition. (Def. Exh. 1, Desmond Depo., at 161-62). During her continued deposition on June 18, 2009, the Plaintiff admitted that she still had difficulty concentrating, could not perform wound care as a physician assistant, could not work with sutures, could not change a patient's dressings, could use a retractor in surgery only for a short time and only with her left hand, could not perform any functions requiring two hands, and could not draw blood or start an IV. Id. at 263,

281-85.  Even more recently, in a letter dated October 21, 2009 to the Connecticut Workers' Compensation Commission, the Plaintiff stated that she hoped that her pain could be alleviated to "ultimately return to the point where I may return to work as a medical practitioner."  (Def. Exh. 19, Letter from Plaintiff to Workers' Compensation Commission).  The Plaintiff has never been released to work by any treating physician, and continues to receive "temporary total disability benefits" through the Workers' Compensation Commission process, as she has continuously since February 2005.  (Def. Exh. 20, Ross Aff., ¶¶ 4-5).

Despite her continuous receipt of total disability benefits, the Plaintiff makes no effort to explain why her contention for purposes of Workers' Compensation that she is too disabled to work is consistent with her current claim that she can perform the essential functions of her job.  See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797-98 (1999) (holding that pursuit and receipt of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim, but that, to defeat a defendant's motion for summary judgment, the ADA plaintiff receiving such benefits must "explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job").

In opposition to summary judgment, the Plaintiff relies heavily on statements made in dicta by the CHRO in its "Decision on Request for Reconsideration."  (Pl. Exh. 85, CHRO Decision on Request for Reconsideration, December 7, 2006).  This ruling by the CHRO was issued after the agency had dismissed the Plaintiff's initial discrimination complaint at the first stage of

review, the "merit assessment" stage. The Plaintiff's complaint was dismissed at merit assessment for two reasons: first, because there was no reasonable possibility that further investigation would result in a finding of reasonable cause that discrimination had occurred; and second, because the complaint failed to state a claim for relief because it was untimely filed. Id. at 2. The Plaintiff requested that the CHRO reconsider that dismissal. The CHRO affirmed the dismissal, finding that the Plaintiff had missed the filing deadline and that there was no compelling reason to apply the doctrine of "equitable tolling." However, although unnecessary to its ultimate holding, the CHRO further expressed the opinion that the agency's investigator had erred in finding that there was "no reasonable possibility of a reasonable cause finding." Id. at 5. Specifically, the CHRO noted:

> The problem [with the Defendant's position] is that the [Plaintiff's] treating physician did not indicate that she could not return to work . . . . The doctor did not, in this [August 12, 2005] correspondence, opine that the complainant could not return to work. In addition, there is also a lack of record evidence supporting the [Defendant's] contention that the [Plaintiff's] restrictions could not be accommodated. The [Defendant] (and the commission) did not explain how the driving, childcare and lifting restrictions impacted the complainant's essential job duties or why they could not be accommodated.

Id. at 4-5.

The Plaintiff uses this statement by the CHRO in an attempt to raise a genuine issue of material fact as to whether she did in fact have the capacity to work as a physician assistant. However, her effort is unavailing. As an initial matter, the CHRO's decision on reconsideration is not admissible evidence and therefore should not be considered on summary judgment. The decision was

issued following the first stage of the administrative proceedings, merit assessment, after the Plaintiff requested reconsideration of the dismissal of her complaint.  The CHRO had not interviewed any witnesses at that point, and the inquiry consisted solely of the submission of documents by both parties.  The only question at that stage of the inquiry was whether the Plaintiff's complaint should be retained for full investigation or dismissed.  Finally, the discussion relied upon by the Plaintiff was not necessary to the CHRO's ultimate holding affirming dismissal of her complaint.  In these circumstances, the probative value of the decision is slight, and is substantially outweighed by the danger of prejudice to the Defendant from its admission.  See Fed. R. Evid. 403; see also Barlow v. State of Connecticut, 319 F. Supp. 2d 250, (D. Conn. 2004) (striking a CHRO "reasonable cause" finding from summary judgment record because that finding was simply a discussion of whether discrimination "could have occurred"); Keene v. Hartford Hosp., 2008 F. Supp. 2d 238, 243 (D. Conn. 2002) (excluding CHRO reasonable cause report because it was merely a "preliminary investigation into whether discrimination could have occurred").  Further, the CHRO statement was not a finding of discrimination, but rather a description of the insufficiency of the investigator's initial report.

Moreover, even assuming arguendo that the CHRO's decision is admissible, the dicta statements upon which the Plaintiff relies do not raise a genuine issue of material fact regarding the Plaintiff's work capacity, for the simple reason that the Plaintiff herself stated repeatedly in her deposition testimony that she could not perform her job duties as a physician assistant as a

result of her disability.[2]  Indeed, the Plaintiff expressly admitted that she was "temporarily totally disabled" during the entire period of time from February 2005 until the date of her deposition in April 2009.  (Def. Exh. 1, Desmond Depo., at 161-62).  The CHRO did not have the benefit of a full evidentiary record when it was reviewing the Plaintiff's complaint as this Court now does.  Therefore, the CHRO's preliminary, speculative opinion that there was a possibility that further investigation could result in a finding that discrimination had occurred does not create a genuine issue of material fact so as defeat to the Defendant's motion for summary judgment, especially where, as in this case, the record before the CHRO was deficient.

Based upon the foregoing evidence, including the repeated admissions of the Plaintiff, the Court concludes that the Plaintiff was unable to perform the essential functions of her job as a physician assistant at the time of her termination, and remained unable to so at least until the time of her continued deposition in June 2009.  This conclusion does not end the inquiry, however, because the Plaintiff further argues that the Defendant could have provided her with reasonable accommodations that would have rendered her capable of performing the essential functions of her job.  The Court next addresses this claim.

## B. Reasonable Accommodation

As an initial matter, the Plaintiff incorrectly cites Owens v. New York City Housing Authority, 934 F.2d 405 (2d Cir. 1991) for the proposition that she is

---

[2]  The Plaintiff's contention that there were accommodations that would have enabled her to perform her job are fully discussed below.  See infra Section III.B.

required only to establish that she "possesses the basic skills necessary for performance of the job" in order to demonstrate that she is "qualified" for the position of physician assistant. However, the <u>Owens</u> case involved an ADEA claim involving satisfactory job performance, in which the Second Circuit held that the "qualification" prong of the prima facie case may be met without regard to misconduct or performance problems that led to the plaintiff's termination. <u>Id.</u> at 409. The <u>Owens</u> standard is not applicable in an ADA case that requires the Court to determine whether a plaintiff is physically capable of performing the essential functions of her job with or without reasonable accommodation in light of her disability.

The Second Circuit described the standard applicable to ADA claims in <u>Rodal v. Anesthesia Group of Onondoga, P.C.</u>, 369 F.3d 113, 118 (2d Cir. 2004). When "a disabled plaintiff claims that [s]he can perform a particular job with a reasonable accommodation, the prima facie burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." <u>Id.</u> "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment[.]" <u>McBride v. Bic Consumer Prods. Mfg. Co.</u>, 583 F.3d 92, 97 (2d Cir. 2009).

The Defendant argues that the Plaintiff has not established a prima facie case based on its alleged failure to reasonably accommodate her disability because she has produced no evidence of any reasonable accommodations that would have enabled her to perform the essential functions of her job. In response to the Defendants' motion for summary judgment, the Plaintiff identifies two types of accommodation that she claims would have permitted her to perform her job as a physician assistant. First, she asserts that certain tasks that she was unable to perform could have been performed by other members of the medical team. Pl. Opp. at 20. Second, she claims that the Defendant had an obligation to provide her with reasonable and necessary medical treatment that would have permitted her to perform her job. Pl. Opp. At 28-29. In addition, the Plaintiff argues that the Defendant failed to engage an interactive process with her to identify and implement appropriate reasonable accommodations. Each contention will be addressed in turn.

### 1. Delegation of Tasks to Other Members of the Medical Team

The Plaintiff argues that one possible accommodation that the Defendant could have provided to her was the performance of tasks by other members of the medical team, which she claims was already an integral part of the job description for a physician assistant. In support of this proposition, the Plaintiff cites language in the job description which states that the physician assistant will "work collaboratively with the multidisclipinary team to provide optimum care for patients during their hospital stay. The PA/NP will work in parallel with the PGY1 and/or PGY 2 Residents assigned to that service . . . . Responsibilities will be

shared with the Junior Residents and specific division of duties will be determined by the Chief Resident."  (Pl. Exh. 1, Job Description).  According to the Plaintiff, such an accommodation would present a "minimal" if any burden to the Defendant.  Pl. Opp. at 21.

"Job restructuring" is explicitly included as a possible "reasonable accommodation" under the ADA.  42 U.S.C. § 12111(9)(B).  While the term "job restructuring" is not defined in the ADA, regulations promulgated by the EEOC under the ADA explain that "[a]n employer or other covered entity may restructure a job by reallocating or redistributing *nonessential, marginal* job functions."  29 C.F.R. pt. 1630, App. § 1630.2(o) (emphasis added).  "An employer may also restructure a job by altering when and/or how an essential function is performed."  Id.  For example, an employer may restructure a job by rescheduling an essential function to later in the day for an employee who cannot perform the function in the early morning hours or by permitting an employee with a disability that inhibits her ability to write to computerize records rather than maintaining them manually.  Id.  However, the regulations specifically note that an employer "is not required to reallocate essential functions."  Id.  Likewise, the Second Circuit has held that a "reasonable accommodation can never involve the elimination of an essential function of a job."  Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d Cir. 2003); see also Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991) ("[R]easonable accommodation does not mean elimination of any of the job's essential functions.").

"Essential functions" are defined by regulation to mean the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" Shannon, 332 F.3d at 100 (citing 29 C.F.R. § 1630.2(n)(1)). "A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Id.

As noted previously, the Plaintiff herself admitted during her deposition that she was totally disabled and unable to perform the duties of a physician assistant during the period from February 2005 up to the date of the deposition. As the evidence submitted by the Defendant establishes and as the Plaintiff admitted, those essential duties which the Plaintiff was unable to perform included, among other things, performing wound care, working with sutures, changing dressings, using a retractor for a lengthy period of time, administering CPR, and drawing blood. In opposition to summary judgment, she does not disclaim that these duties were essential job functions, nor does she present countervailing evidence indicating that she was in fact capable of performing these duties. Instead, she basically argues that she should have been permitted to return to work, but be exempted from performing any physical job duties that involved the use of her hands. The only job duties that she identifies as tasks she would have actually been able to perform are "assessing patients, carrying beepers, reviewing and writing orders, [and] consulting with other medical specialties." Pl. Opp. at 21. Thus, In the Plaintiff's view, the Defendant should have accommodated her by delegating virtually all fundamental duties of a physician assistant, which she otherwise would have regularly performed herself,

to other members of the medical team.  Such a request is not reasonable, and is unsupported by the case law.

Although the Second Circuit Court of Appeals has not specifically addressed the argument made by the Plaintiff in this case, numerous district court decisions from within and outside this Circuit that have rejected similar arguments are persuasive.  For example, in <u>Wells v. BAE Sys. Norfolk Ship Repair</u>, 483 F. Supp. 2d 497 (E.D. Va. 2007), a shipfitter sued her former employer under the ADA, alleging that the company had refused to accommodate her and unlawfully terminated her employment after she suffered serious physical injuries.  The court reviewed the duties of a shipfitter and determined that the job required a number of heavy physical tasks, such as carrying a heavy bag of tools and using hand tools.  <u>Id.</u> at 509.  The court then concluded that the plaintiff was unable to perform these essential physical duties and held that the defendant was not required to retain her as an employee even though she could perform certain administrative functions.  <u>Id.</u>  The court explained as follows:

> Wells contends that the essential functions of a shipfitter include certain administrative functions and that she remained able to perform those administrative functions following the accident. However, even if Wells's contentions are true, the fact remains that the essential functions of a shipfitter included, in addition to administrative functions, physical duties that she was unable to perform.  As a result, BAE could not have retained Wells as an employee unless it transferred essential functions of her position to another employee.  The ADA imposes no such requirement on an employer.

<u>Id.</u> at 509.  The court therefore granted the employer's motion for summary judgment.

Similarly, in <u>Dreiling v. Mowery Clinic, LLC</u>, No. 06-1065-WEB, 2007 WL 2893581 (D. Kan. Sept. 28, 2007), the plaintiff was a phlebotomist who developed a spinal cord inflammation that left her physically impaired, including by affecting her balance. Her employment was terminated, even though she claimed that she could work as a phlebotomist if she could sit down on the job. The plaintiff subsequently brought an ADA claim against her employer. The court found that the plaintiff was capable of performing many of the essential functions of her job, such as preparing equipment, identifying and labeling specimens, instructing patients on collection procedures, communicating with patients, and entering patient orders in the computer. <u>Id.</u> at *23. Nevertheless, the court held that the plaintiff was unable to perform several other essential functions of her job, and therefore granted summary judgment in favor of the defendant. The court's reasoning was as follows:

> The idea of accommodation is to enable an employee to perform the essential functions of his or her job. Plaintiff cites no evidence that she herself would have been capable of lifting or controlling a resistive child or bending or stooping to draw blood from a patient at a difficult angle. Nor does she explain how she would have been able to physically assist and protect faint patients from injuring themselves, or how she could have handled the job during those times when there was only a single phlebotomist on duty. What she is essentially arguing is that if someone else had been assigned to perform all of the physical tasks she could not do, then she would have been able to assist by performing the remaining functions. Such job restructuring, however, is not considered a reasonable accommodation under the ADA.

<u>Id.</u>; <u>see also</u> <u>Mitchell v. Washingtonville Central School District</u>, 992 F. Supp. 395, 410 (S.D.N.Y. 1998) (holding that restructuring of plaintiff's job to accommodate plaintiff was not reasonable because it would have required his employer to

"revamp the position, stripping it of most of the physical labor and many of the duties that are contemplated by the job;" further concluding that reassignment of physical duties to other staff was not a reasonable accommodation because it would "require the elimination of essential functions of the job").

The reasoning of these cases is equally persuasive here.  The accommodation the Plaintiff suggests would require the Defendant to assign several physical duties that she would otherwise be expected to perform herself on a regular basis to other members of the medical team, and would thus require the elimination of essential functions of her job.  Further, such an accommodation would potentially jeopardize the welfare and safety of the Defendant's patients in emergency situations, which customarily occur in hospital settings.  Therefore, it does not qualify as a reasonable accommodation.

### 2. Provision of Medical Treatment as a Reasonable Accommodation

The Plaintiff also argues that the Defendant was required to provide her with medical treatment as a reasonable accommodation, along with sufficient time to heal following the treatment.  The Defendant, on the other hand, asserts that the provision of medical treatment by an employer is not a reasonable accommodation under the ADA.

The ADA defines "reasonable accommodation" as including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations

for individuals with disabilities."  42 U.S.C. § 12111(9)(B); <u>see also</u> <u>Lovejoy-Wilson</u>

<u>v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 217 (2d Cir. 2001).  Regulations

promulgated by the EEOC under the ADA further define accommodations as

> (i)  Modifications or adjustments to the job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii)  Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
>
> (iii)  Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).  The regulations make clear that, while the foregoing list

is not exhaustive, a "reasonable accommodation" is generally "any change in the

*work environment* or in the way things are customarily done that enables an

individual with a disability to enjoy equal employment opportunities."  29 C.F.R.

pt. 1630, App. § 1630.2(o) (emphasis added); <u>see also</u> <u>Deane v. Pocono Medical</u>

<u>Center</u>, 142 F.3d 138, 146 n.9 (3rd Cir. 1998).  Nothing in the text of the ADA or in

the regulations promulgated thereunder contemplate that an employer should be

required to provide a disabled employee with medical treatment in order to

restore her ability to perform essential job functions.  This interpretation is

supported by the EEOC's Enforcement Guidance, which notes, for example, that

"an employer is not required to provide an employee with a prosthetic limb, a

wheelchair, eyeglasses, hearing aids, or similar devices if they are also needed

off the job."  <u>EEOC Enforcement Guidance: Reasonable Accommodation and</u>

Undue Hardship Under the Americans with Disabilities Act, EEOC Compliance Manual, § 92, No. 915.002, available at http://www.eeoc.gov/policy/docs/ accommodation. html# N_105_ (Oct. 17, 2002). Similarly, the EEOC has explained that

> Medication monitoring is not a reasonable accommodation. Employers have no obligation to monitor medication because doing so does not remove a workplace barrier. Similarly, an employer has no responsibility to monitor an employee's medical treatment or ensure that s/he is receiving appropriate treatment because such treatment does not involve modifying workplace barriers.

Id. (citing Robertson v. The Neuromedical Ctr., 161 F.3d 292, 296 (5th Cir. 1998)). The medical treatment sought by the Plaintiff in this case – ostensibly, intensive pain management and psychiatric care (see Pl. Exh. 21, Dr. Swigart Medical Note, September 27, 2005) – does not propose or reference any change in the work environment or involve the removal of workplace barriers, and therefore is not a reasonable accommodation.

Nevertheless, the Plaintiff makes the novel argument that the Defendant's alleged failure to provide medically necessary treatment as required by the Connecticut Workers' Compensation Act has rendered her sufficiently disabled to avoid application of the ADA, and therefore the Defendant should be held liable for failing to provide medical treatment as a reasonable accommodation under the ADA. As an initial matter, there is no legal support for the contention that State workers' compensation law creates a duty to accommodate under the ADA. Indeed, the Court previously dismissed the nine counts of the Plaintiff's original complaint asserting State law claims for the Defendants' alleged wrongful delay and denial of benefits and treatment through the workers' compensation process.

<u>Desmond v. Yale-New Haven Hosp., Inc.</u>, No. 3:08-cv-00346(VLB), 2009 WL 792346, at *3 (D. Conn. Mar. 23, 2009). That decision clearly held that those claims were barred by the Connecticut Supreme Court's binding interpretation of the exclusivity provision of the Connecticut Workers' Compensation Act. <u>Id.</u> at *2 (citing <u>DeOliveira v. Liberty Mutual Ins. Co.</u>, 273 Conn. 487 (2005)); <u>see also</u> <u>Yulle v. Bridgeport Hosp.</u>, 89 Conn. App. 705, 708 (2005) (holding that exclusivity provision barred employee's tort claim against self-insured hospital arising from hospital's alleged unreasonable delay of payments of workers' compensation benefits). The Plaintiff's current attempt to defeat the legislative intent of the Connecticut Workers' Compensation Act by asserting wrongful delay and denial of certain workers' compensation benefits as an ADA failure to accommodate claim is unavailing.

Furthermore, the sole legal authority that the Plaintiff relies upon in support of her argument that she was entitled to proper medical treatment as a reasonable accommodation is the Northern District of California's decision in <u>Dunlap v. Association of Bay Area Gov'ts.</u>, 996 F. Supp. 962 (N.D. Cal. 1998). The court in <u>Dunlap</u> held that the plaintiff had sufficiently pleaded a claim for violation of Title III of the ADA, which prohibits discrimination by public accommodations on the basis of disability, by alleging that his employer (which the parties agreed constituted a public accommodation in its provision of insurance) refused to authorize necessary medical care and treatment. The <u>Dunlap</u> case is not binding on this Court and, in any event, is inapposite because the sole surviving claim in this case is an employment discrimination claim under Title I of the ADA, not a

public accommodations claim under Title III of the ADA.  The Plaintiff cites no authority to support her position that the Defendant's alleged delay and denial of payment for medical care through the workers' compensation process constitutes a violation of Title I of the ADA.  In this Court's view, an interpretation of "reasonable accommodation" that would require a private employer to provide for all treatments that a disabled employee deems necessary to restore her capacity to perform essential job functions is an unwarranted extension of the duty to accommodate under Title I of the ADA.

Finally, it is clear from the record in this case that the Plaintiff did in fact receive medical treatment, including surgery and all related post-operative medical treatment, as well as total disability benefits, through the workers' compensation process.  The fact that she believes certain treatments were unduly delayed or denied during that process simply does not give rise to a cognizable ADA failure to accommodate claim.

Since the provision of medical treatment is not a reasonable accommodation, essentially what the Plaintiff is requesting is a leave of absence until she is sufficiently recovered from her disability to enable her to perform her essential job functions.  However, she has provided no indication of when she is likely to be able to return to work, instead merely stating that she is "hopeful" that she could at some point be able to return to a job.  (Def. Exh. 1, Desmond Depo., at 162).  It is well-established that "[t]he ADA does not require an employee to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence."  <u>Mitchell v. Washingtonville Cent.</u>

School Dist., 190 F.3d 1, 9 (2d Cir. 1999) (quoting Nowak v. St. Rita High Sch., 142

F.3d 999, 1004 (7th Cir. 1998); see also Mcnamara v. Torneau, Inc., 496 F. Supp. 2d

366, 377 (S.D.N.Y. 2007) ("An employer cannot reasonably be expected to hold a

job open for an employee without some indication that the employee is likely to

return and some idea of when that is likely to happen.").  Therefore, the Plaintiff

has not demonstrated that the Defendant failed to provide her with a reasonable

accommodation that would have enabled her to perform her essential job

functions.

### 3. Failure to Engage in an Interactive Process

Finally, the Plaintiff asserts that summary judgment should be denied

because the Defendant failed to engage in an "interactive process" in an attempt

to accommodate her disability.  However, as the Defendant correctly argues, this

claim is foreclosed by controlling Second Circuit law.  See McBride v. Bic

Consumer Prods. Mfg. Co., 583 F.3d 92 (2d Cir. 2009).

In McBride, the plaintiff was a utility operator who developed respiratory

and psychological problems that prevented her from working.  Id. at 94.  She took

an extended leave of absence pursuant to an employment contract, but her

doctors then cleared her to return to work with significant restrictions on her

duties.  Id. at 95.  The company offered the plaintiff a respirator, but she refused.

Thereafter, neither party discussed any additional potential accommodations.  Id.

The district court granted summary judgment for the employer on the basis that

she failed to make out a prima facie case of disability discrimination.  On appeal,

the plaintiff argued that her failure to identify an accommodation should be

excused in light of her employer's "failure to engage in a sufficient interactive process intended to develop a mutually agreeable accommodation of her disability." __Id.__ at 99. The Second Circuit rejected the Plaintiff's contention, explaining as follows:

> Even assuming, without deciding, that BIC did fail to engage in such a process, this contention is meritless. Admittedly, the ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. That being said, the ADA imposes liability for, inter alia, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible.

__Id.__ at 100 (internal citations and quotation marks omitted). Accordingly, the Second Circuit held that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." __Id.__ at 101.

The reasoning of __McBride__ bars the Plaintiff's claim in this case. Even assuming that the Defendant failed to engage in an interactive process, the Plaintiff cannot defeat summary judgment because she has failed to identify any reasonable accommodation that would have enabled her to perform essential functions of her job as a physician assistant. The only accommodations that she does suggest – reassignment of many of her duties and the provision of medical treatment – are not reasonable for the reasons discussed above. There is no evidence in the record of any other accommodation that the Plaintiff proposed or

that the Defendant could have provided, and therefore the Defendant is entitled to summary judgment on the Plaintiff's ADA claim.

## IV. <u>CONCLUSION</u>

Based upon the above reasoning, the Plaintiff has not made out a prima facie case of disability discrimination because she has failed to establish that she could perform the essential functions of her job as a physician assistant, with or without reasonable accommodation.  Accordingly, the Defendant's motion for summary judgment [Doc. #77] is GRANTED.  The Clerk is directed to enter judgment for the Defendant, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford Connecticut:  September 10, 2010.